UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x

MERLIN ALSTON,

               Petitioner,

    - v. -

UNITED STATES OF AMERICA,

               Respondent.

——————————————————————————x

19 CV 7858 (CM)
15 CR 435 (CM)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 6|10|2021

### DECISION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE HIS CONVICTIONS PURSUANT TO 28 U.S.C. § 2255

McMahon, J.:

Merlin Alston, a corrupt police officer, was convicted on October 31, 2016, after a seven-day trial on both counts in Indictment S3 15 Cr. 435 (CM). Count One charged Alston with conspiring to distribute and possess with the intent to distribute controlled substances, specifically five kilograms and more of cocaine, one kilogram and more of heroin, and a quantity of molly, from at least in or about 2010, up to and including in or about 2014, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(C) and 846.[1] Count Two charged Alston with using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the narcotics conspiracy charged in Count One, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and (2).

On July 26, 2017, Alston was sentenced by this Court to a 240 months term of imprisonment (180 months' on Count One, and 60 months' on Count Two—those sentences running consecutive).

---

[1] The jury found beyond a reasonable doubt that the conspiracy involved five kilograms and more of cocaine, and a quantity of molly, but not heroin.

Alston's convictions were affirmed on direct appeal. *United States v. Alston*, 899 F.3d 135 (2d Cir. 2018), *cert. denied* 139 S. Ct. 1282 (2019).

Before the Court is Alston's motion to vacate his convictions pursuant to 28 U.S.C. § 2255. Alston claims his trial counsel provided ineffective assistance. Alston also asks that the Court direct the Government to provide him with discovery concerning misconduct on the part of the principal cooperating witness, Gabriel Reyes, which occurred while Reyes was incarcerated at the Metropolitan Correctional Center, months after he testified at Alston's trial. Defendant believes such discovery will uncover suppressed *Brady* material by the Government. *See Brady v, Maryland*, 376 U.S. 63 (1963).

All motions are denied.

### The Trial

At trial, the Government presented the testimony of nine witnesses, including the testimony of three witnesses who participated in drug deals in which Alston was involved: Gabriel Reyes, a/k/a "Guy," Jonathan Sambula, a/k/a, "Bula," and Jose Vera, a/k/a "JB." This testimony was corroborated by, among other things, wiretap recordings of Alston, a consensual recording of Alston made by Reyes, video of Alston and Reyes together, photographs of Alston and Reyes socializing together at nightclubs, law enforcement surveillance, and drug seizures from Alston's co-conspirators. In short, the evidence against Alston was overwhelming.

### A.    Alston Joins the Reyes Narcotics Conspiracy

Alston and Reyes grew up together in the Bronx and were friends long before Alston was a police officer or Reyes sold drugs. Tr. 91-92 (Reyes).

In 2008, Reyes started selling marijuana. By that time, Alston had joined the New York City Police Department ("NYPD"). Tr. 92-94 (Reyes). However, because of their close

relationship, Reyes did not hide his marijuana dealing from Alston. Tr. 95-96 (Reyes). In 2008 or 2009, Reyes moved from selling marijuana to selling to cocaine. Tr. 95-96 (Reyes). As with his prior marijuana dealing, Reyes did not hide his cocaine dealing from Alston. Tr. 97 (Reyes).

During this early time period, Alston did not do anything to affirmatively assist Reyes's drug business, but neither did Alston do anything to dissuade him from selling drugs. Tr. 95-99 (Reyes). One day in 2009, Alston crossed the line from passive observer to co-conspirator by helping Reyes make a delivery of cocaine. Alston offered to drive Reyes to drop off the cocaine because it would be safer, and Reyes accepted the offer. Tr. 97 (Reyes).

Over the next four years, Alston helped drive Reyes to and from approximately 30 drug deals involving cocaine or molly, with the amount of cocaine in those deals adding up to approximately 40 kilograms. Tr. 103-04 (Reyes). Alston also helped Reyes package cocaine prior to drug deals. Tr. 105 (Reyes). In total, Reyes distributed approximately 200 kilograms of cocaine between 2009 and 2014. Tr. 304 (Reyes).

Having Alston present during drug deliveries and pickups protected Reyes from the risk of being stopped and searched by the police. For example, one time, when Reyes was doing a cocaine delivery by himself, he was stopped by the police for a traffic violation and was worried about the prospect of his vehicle being searched. But Alston rushed to the scene and smoothed things over with the police officer who had stopped Reyes. Tr. 125-29 (Reyes).

Alston also gave Reyes Police Benevolent Association ("PBA") cards and a "mini-badge" that listed Alston's name and number to assist Reyes with the police when Alston was not present. Tr. 129-32 (Reyes); GX 1303-C, 1303-D. On at least one occasion, Reyes used one of Alston's PBA cards to avoid police suspicion during a traffic stop in which Reyes had a substantial quantity of cocaine in his vehicle. Tr. 132 (Reyes). Reyes's testimony about how

Alston assisted him during traffic stops was corroborated by a recorded phone call placed to Alston by a law enforcement officer following a traffic stop of Reyes in 2014, in which Alston lied to the officer about being Reyes's brother-in-law in an attempt to have the officer let Reyes go without any consequences. Tr. 747-52 (Baird); Tr. 138-40 (Reyes); GX 601-T.

Alston also protected Reyes from other drug dealers. Alston carried his NYPD handgun when driving Reyes to and from drug deals, and on occasion stashed that handgun in secret compartments in Reyes's vehicles used to conceal drugs. Tr. 120 (Reyes). Alston also observed Reyes in possession of handguns, and Reyes told Alston where he hid firearms in his vehicles. Tr. 121 (Reyes). Reyes testified that he and Alston had developed an understanding in the course of their relationship: "He'll do what he had to do. Merlin would do what he had to do if he had to. That was the understanding. He'll protect me." Tr. 122 (Reyes).

In 2011 or 2012, Reyes had a dispute with another drug dealer named Levit, who thought Reyes owed him money and had stolen his drug supplier. They had a physical fight at a strip club, and then bumped into each other again outside of a diner. Levit threatened Reyes, and summoned other men to come and shoot Reyes. When those other men arrived, they saw and recognized Alston, and consequently failed to follow through on Levit's orders. Tr. 221-25 (Reyes). However, a few weeks later, when Alston was not with Reyes, another of Levit's associates fired shots at Reyes. Tr. 225-28 (Reyes).

During the time period that Alston was a member of Reyes's drug conspiracy, Alston repeatedly changed his cellphone number, and advised Reyes to use special internet-based messaging programs to avoid having his communications intercepted by law enforcement. Tr. 181-82 (Reyes). Reyes's testimony on this point was corroborated by records showing that Alston had at least five different cellphone numbers over a five-month period in 2014. GX 601,

4

702-707, 710, 714, 719, 721-22, 725-26, 732-34, 801-04.

By working with Reyes, Alston gained access to a lifestyle that he could not otherwise afford.  Reyes spent about half of his drug profits paying for his entourage, including Alston, at nightclubs, and lent Alston expensive jewelry.  Tr. 186, 191 (Reyes).  Social media postings of Alston and Reyes partying at nightclubs, with Alston wearing diamond necklaces and luxury watches lent to him by Reyes, corroborated Reyes's testimony concerning their shared lavish lifestyle.  GX 401-C, 401-E, 401-G.

During that time, Alston was introduced to a number of other drug dealers through Reyes, including Sambula and Vera, and Alston reciprocated by offering to introduce Reyes to other drug dealers.  Tr. 287- 90 (Reyes); Tr. 568-69 (Vera); Tr. 758 (Sambula).  Sambula explained that Alston's behavior at nightclubs was one of the reasons he trusted Alston to be present at drug deals, despite Alston's being a police officer;  Sambula viewed Alston as "part of our team." Tr. 761-62 (Sambula).

**B.     Alston's Attempt to Connect Reyes to Other Drug Dealers in 2011**

In 2011, when Reyes was having difficulties obtaining cocaine to sell, Alston offered to put Reyes in touch with other drug suppliers that Alston knew, named "Cabo" and "Ish."  Tr. 287-90 (Reyes).

Alston's connection to Cabo and Ish was corroborated by wiretap recordings and testimony from NYPD Sergeant Leo Nugent, who was involved in an investigation into Cabo and Ish that resulted in significant seizures of narcotics from both of them.  Tr. 725-40 (Nugent). Sergeant Nugent testified that, on one occasion in 2011, his team of investigators intercepted a communication in which Cabo stated that he believed law enforcement officers were conducting surveillance on him, and that Cabo was therefore going to have someone named "Murphy"

5

conduct counter-surveillance. Tr. 728 (Nugent). Sergeant Nugent then went to Cabo's location to conduct surveillance, and observed Alston arrive on a motorcycle. Tr. 729 (Nugent). Cabo then got into an SUV and drove off, with Alston following closely behind Cabo's SUV. Tr. 729-30 (Nugent). Sergeant Nugent also testified about how large quantities of cocaine, crack, and marijuana were seized from Cabo's residence later in 2011, along with a photograph showing Alston together with Cabo, Ish, and others. Tr. 735, 737-40 (Nugent); GX 5 (stipulation); GX 109A (cocaine); 109B (cocaine base); 109C (marijuana); 109D (marijuana); 1304 (photo).

Wiretap recordings of Alston speaking with both Cabo and Ish also corroborated the existence of their relationship. GX 906, 908; Tr. 732-35 (Nugent).

C.     **Drug Deals Involving Cooperating Witnesses Sambula and Vera in 2012**

In addition to Reyes, cooperating witness Jonathan Sambula and Jose Vera also testified about observing Alston participate in significant drug deals.

Vera described two interactions he had with Alston in 2012. The first was at Reyes's birthday party at a nightclub in the Bronx, when Vera first met Alston in person. After the party, Vera and his cocaine-selling partner "B" bumped into Reyes and Alston. Alston told B that Alston had "birds" – which Vera explained was code for kilograms of cocaine – for him. Tr. 568-69 (Vera). They exchanged numbers and socialized for the rest of the night. Tr. 571 (Vera).

Then, a few months later, Vera saw Alston again. Vera and his cocaine-selling partners, Polo and B, were out of cocaine. But then Polo called Vera and told him they were going to get some from Alston and Reyes at an auto repair shop. When they got there, Reyes's grey Honda Accord, equipped with a secret compartment for hiding drugs, was parked outside. Alston handed Polo the keys to the Honda and said "That's in the whip. I'll wait for you here." Polo took the keys from Alston and drove the Honda away. Tr. 573-79 (Vera). The next day, Vera

went to Polo's house and helped re-package the four kilograms of cocaine they had gotten from Alston and Reyes. Tr. 579-80 (Vera).

Sambula testified about how Alston accompanied Reyes to two drug deals in 2012. In the first deal, Reyes visited Sambula's apartment on Valentine Avenue while Alston and others waited outside in a red Ford Explorer for approximately two hours, as Sambula and Reyes packaged a kilogram of cocaine. During that time, Alston repeatedly called Reyes to check in on him. Tr. 763, 765-66, 769-84 (Sambula). Another time, Alston and Reyes pulled up outside Sambula's apartment in Reyes's grey Honda Accord, and Reyes got out of the car and passed Sambula a bag full of cocaine on the street. Tr. 784-86 (Sambula).

Sambula also testified about how he was arrested in late 2012 and, while being questioned, observed Reyes's and Alston's names on a federal agent's notepad. Tr. 789-91 (Sambula). When Sambula alerted Alston to that fact, Alston responded: "They're just going to have to come lock me up." Tr. 791-92 (Sambula). Shortly after that, Alston warned Sambula that an apartment he used to stash drugs had been "red flagged," which Sambula understood to mean that the apartment was going to be searched by the police. As a result, Sambula, removed drugs and related paraphernalia from the apartment. Tr. 803-04 (Sambula).

### D.    Alston's Recorded Tipoffs in 2014

The wiretap evidence at trial included recordings showing that Alston provided confidential police information about active investigations to drug dealing associates of Reyes, specifically Jeffrey Vargas, a/k/a "Jeff," who was one of Reyes's primary cocaine suppliers, and Harold Mercedes, a/k/a "Benz," who was Vargas's business partner. Tr. 111-18 (Reyes).

In one call on March 11, 2014 between Vargas and Mercedes, Mercedes stated "Merl wanted to talk to you, ASAP . . . He said, you know ASAP. That you name is going around

7

there. . . .  He told me he can't speak on the phone . . . you should be on the alert." GX 723-T.

Two months later, on May 7, 2014, Alston called Vargas directly to warn Vargas about anticipated arrests in Vargas's area, stating "let them know that I'm com – [pause] that I have to go over there [pause] so to [chuckles] to ghost, to be gone."  Vargas responded "you gotta snatch somebody up?" and Alston responded "Well, well, yeah.  Well, supposedly, so just let them know." GX 726-T.  Vargas then passed that information along to an unidentified co-conspirator, stating "Oh, if you have the phone number of any of the guys, tell them to, to be careful.  My buddy Merl called me and told me it looks like they're going to bust them over there . . . or something." GX 727-T.

### E.   Alston's Use of a Shotgun to Protect Reyes at a Meeting of Drug Dealers

On March 20, 2014, Alston provided armed security to Reyes at a meeting of drug dealers.

Prior to that meeting, Reyes had gotten into a fight at a nightclub with another drug dealer, named "BX Hova," over a romantic interest.  While the fight was not initially over drugs, BX Hova had the same drug supplier as Reyes—Jeffrey Vargas—and Vargas believed that the feud was going to be bad for their respective drug businesses.  Tr. 233, 263, 540 (Reyes).  As a result, Vargas arranged a meeting at a restaurant to mediate the dispute between his two drug customers, Reyes and BX Hova, and ensure that the dispute wouldn't affect the parties' drug businesses.  Alston agreed to wait outside the restaurant with a shotgun to provide security for Reyes in case the meeting turned violent.  Luckily, the meeting went smoothly, and there was no need for Alston to brandish or discharge the shotgun.  Tr. 231-75, 282-86 (Reyes).

Reyes's testimony about this meeting was corroborated in great detail by a series of wiretap recordings of calls between Reyes and Alston, as well as recorded video and law

enforcement surveillance. GX 701-T-709-T, 501-A-C, 501-02, 501-22; Tr. 553-57 (Maselli). In their initial conversation about the proposed meeting, Reyes asked Alston "What you think? I should go see what's up? I should hear that nigga out or nah?" And Alston responded "Yeah, I'll go with you." GX 702-T. In a subsequent planning call, using coded language, Alston asked if he should pick up Reyes's shotgun to bring to the meeting: "Yo, you want me to come and um [pause] pick that up from you or no?" GX 704-T. Alston also referred to the shotgun as "that noise," "that big piece," "the big one," and the "three-sixty controller for the, the new X-Box shit." GX 704-T. When Alston arrived at Reyes's residence, Reyes gave Alston a loaded shotgun inside a large duffle bag. Tr. 238 (Reyes). Video surveillance footage from outside of Reyes's residence recorded that handoff: Reyes can be seen leaving his house with a large duffel bag and giving it to Alston. GX 501-A.

After Alston picked up the shotgun and drove away, Reyes directed him to wait across the street from the meeting location, saying in one call "They in there so park in the other [pause] across the street like next to White Castle looking at it. You feel me?" And Alston responded "alright." GX 705-T. In the next call, Alston advised Reyes how to handle the meeting, specifically that Reyes should "make a statement, squash it, good bye. Have a good day. You know what I'm saying?" GX 706-T. In that call, Alston also told Reyes that Alston already had spoken directly with Vargas's business partner, Harold Mercedes, a/k/a "Benz," about the dispute, and about how it would be bad for business. GX 706-T; Tr. 263 (Reyes).

Later, when Reyes arrived at the meeting location (where Alston had been waiting), Alston told Reyes he wanted to move closer to the meeting location, saying "I'm gonna pull up next to their car." GX 707-T. But Reyes instructed Alston to keep his distance, because he was supposed to come alone, without armed security: "Nah, don't even do that, don't pull up in they

9

face nigga they gonna be shook, nigga.  Just pull up right across the street from the gas station . . . they don't know that my mans is right here, you know what I mean."  GX 707-T.  Detective Leo Maselli testified that he observed Alston sitting across the street from the meeting location, just as Reyes directed, at the time of those calls.  Tr. 553-57 (Maselli).

After the meeting, Alston called Reyes to coordinate bringing the shotgun back to Reyes's house, saying "I'm going to bring this back."  GX 708-T.  Video surveillance footage then showed Alston arriving at Reyes's house, and returning the duffel bag with the shotgun inside.  GX 501-B, C; 501-22.

### F.   Alston's Participation in an Attempted Molly Deal, and Efforts to Obtain a New Cocaine Supplier, in 2014

On April 8, 2014, Alston was serving as Reyes's driver when Reyes was coordinating a large molly deal.  While they were in the car together that day, Alston discussed a potential cocaine supplier, and what would be a good price for a kilogram of cocaine.  Wiretap calls captured a number of their conversations that day.  Tr. 141-64, 170-78 (Reyes).

In a series of calls in the early evening, when Reyes was still at home and had not yet been picked up by Alston, Reyes began coordinating a molly deal with his supplier and a buyer.  In one call, the buyer uses a shorthand for Molly ("the M's") and said the last batch he got was of poor quality ("People complaining that was too salty").  GX 711-T.  Reyes then called a supplier, who said he had good quality molly at a good price ("I got some good shit. .......I haven't gotten no complaints and it's real good and the number is good."), and Reyes said he wanted to purchase the drugs ("So, can you get it and then we go do that shit real quick").  GX 712-T.  Alston and Reyes then exchanged a call and series of text messages about Alston picking Reyes up in his car.  GX 714-T, 802.  After Alston had picked Reyes up, and the two were driving around together, Reyes continued to coordinate the molly deal, telling the buyer that the

10

supplier "got that shit already" and that he was "with my man [Alston], moving right now." GX 715-T.

While Alston was driving Reyes around, Reyes placed a call to another person. While the phone was ringing, the wiretap captured Alston asking Reyes "Yo, he gives it to you for thirty, that's good?" Reyes responded "Hell yeah. Hell no. [laughing] Thirty two, thirty three." Alston then stated "thirty one," and Reyes responded "take that." GX 717-T. Reyes explained that, around that time, Reyes did not have a reliable supply of cocaine, and this conversation related to Alston talking about a potential cocaine supplier and a good price for a kilogram of cocaine. Tr. 162-63 (Reyes).

### G.      Reyes's Consensual Recording of Alston in 2014

Reyes was arrested in July 2014. He promptly agreed to cooperate with the investigation into Alston.

Reyes secretly recorded Alston during a chance meeting in the Bronx on October 17, 2014. During that meeting, Alston told Reyes that people were suspicious that Reyes was cooperating with the police, and Alston told Reyes about a conversation he had with Vargas's cousin, Cesar. In that recording, Alston relates that Cesar said that Reyes was a "snitch." Tr. 341-47 (Reyes). But Alston states to Reyes in the recording that he defended Reyes to Cesar and disputed the rumors that Reyes was cooperating with the police, telling Cesar that "that's my brother" and "I done did everything for him." GX 603-T. Alston then related more of his conversation with Cesar to Reyes, saying "at the end of the day, I said, honestly, if he was I would be in a long time. . . . A long time, a long time." GX 603-T. Reyes stated that he understood Alston to be saying that if Reyes was cooperating, Alston would be going to jail. Tr. 347 (Reyes).

Following the Government's case, Alston declined to testify or call any witnesses. Tr. 888-89.

### The Law

To prevail on a claim of ineffective assistance of counsel, a defendant must (1) overcome a "strong presumption" that his counsel's conduct was reasonable and show that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice." *Strickland v. Washington*, 466 U.S. 688, 688–89, 693 (1984); *accord Chhabra v. United States*, 720 F.3d 395, 406 (2d Cir. 2013). Only if both elements are satisfied can a defendant demonstrate that his counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that the defendant was, as a result, deprived of a fair proceeding. *Strickland*, 466 U.S. at 687; *accord Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011).

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689) (alterations omitted). As the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689 (citation omitted); *accord Bierenbaum v. Graham*, 607 F.3d 36, 50–51 (2d Cir. 2010).

To establish prejudice under *Strickland*'s second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *accord United States v. Levy*, 377 F.3d 259, 264 (2d Cir. 2004). A defendant cannot establish prejudice merely by showing that counsel's errors had "some conceivable effect" on the result, because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693; *see also Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) ("The level of prejudice the defendant need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." (quoting *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001))).

### Alston's Ineffective Assistance of Counsel Claims

Alston has failed to show deficient performance by the two able lawyers who represented him at trial. Many of his arguments focus on aspects of state court criminal practice (omnibus motions, for example) that are simply not part of federal practice. He has not identified a single deficiency in trial counsel's performance.

## I.   ALSTON'S COUNSEL'S PERFORMANCE WAS NOT OBJECTIVELY UNREASONABLE

### 1. Rule 16 Discovery

Alston claims that Trial Counsel failed to move for Rule 16 discovery. (Alston Aff. 19). But counsel did not need to make such motion, since the Government provided Alston with his

Rule 16 discovery.  (*See, e.g.*, Dkt. 6 at 10-11 (July 15, 2015 court conference transcript, in

which Government discussed production of discovery to defense); Dkt. 10 at 4, 22 (July 14,

2015 court conference transcript, in which Court ordered production of discovery to defense);

Dkt. 18 (protective order addressing production of discovery to defense)).

### 2. Bill of Particulars

Alston claims that Trial Counsel's performance was deficient because they failed to

move for a bill of particulars. (Alston Aff. 19).

This argument is also meritless. Such a motion would not have been successful, and

Alston has not even articulated any plausible basis to believe otherwise. A bill of particulars is

generally disfavored in federal practice; it is ordered only where the indictment (as

supplemented by discovery and other disclosures) is not sufficient to provide adequate notice to

a defendant. *See generally United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985). A

bill of particulars is rarely granted in a relatively straightforward narcotics case, such as this one.

*Id.* at 817. Here, the allegations in the indictment were simple and straightforward, and the

Government provided ample discovery illuminating the nature of the specific acts underlying the

conspiracy, such as wiretap applications, recordings, and other material it complied during the

investigation.

Trial Counsel did not fail to make motions. They made the type of motions that were

likely to be successful, such as requesting early provision of a witness list, impeachment

information, and other forms of evidence. (*See* Dkt. 35 at 14-20). Defense counsel's choice to

forego one motion – especially one that was not likely to succeed -- in favor of other motions

directed at similar ends is the sort of strategic decision that is "virtually unchallengeable."

*Strickland*, 466 U.S. at 690.

### 3. Private Investigator

Alston claims that Trial Counsel's performance was deficient because they failed to hire a private investigator. (Alston Aff. 19).

An effective defense does not necessarily require the services of a private investigator. There is no duty to "scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). The efforts of Alston's habeas counsel's demonstate why this is so: new counsel hired a private investigator, who came up with nothing useful, and certainly nothing tending to show that Alston did not commit the heinous crimes of which he stands convicted. (*See generally* Salpeter Aff.). Despite the efforts of Alston's post-trial investigator, the Second Circuit rejected Alston's arguments about purportedly "newly discovered" evidence concerning cooperating witness Gabriel Reyes's car wash business. *Alston*, 899 F.3d at 147. Alston offers no reason to think that further pretrial investigation would have produced any different result, and why it was not a reasonable strategic decision for counsel not to hire a private investigator.

### 4. Motion to Dismiss Count Two

Alston claims that Trial Counsel should have moved to dismiss the firearms count. (Alston Aff. 19). Unfortunately for Alston, the arguments he makes about the sufficiency of the evidence on this count and the supposed statutory exemption for police officers were made in substantially verbatim fashion on direct appeal. *Compare* Adler Aff. at 10-12, *with* No. 17-2405, Dkt. 26 ("App. Br."), at 27-30 (regarding sufficiency); *Compare* Adler Aff. at 8-10, *with* App. Br. at 25-27 (regarding the statutory exemption). The Second Circuit rejected both of these arguments. *See Alston*, 899 F.3d at 144-46. That being so, it cannot possibly have been deficient for counsel to fail to move to dismiss the count; it is not ineffective for a defense lawyer to fail to

pursue a clearly unmeritorious argument. *See United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993).

### 5. Meetings at MCC

Alston claims that Trial Counsel failed to meet with him at the MCC with sufficient frequency. (Alston Aff. 20). But even assuming that were true, it would not give rise to ineffectiveness, unless the defendant can identify some manner in which the infrequency of the visits hindered the preparation of the defense, *see United States v. Jones*, 455 F.3d 134, 148 (2d Cir. 2006). Alston has identified no such hindrance. Rather, Trial Counsel pursued a legitimate, if ultimately unsuccessful, trial strategy, built on attempting to impeach the credibility of the cooperating witnesses. *See generally United States v. Aguirre*, 912 F.2d 555, 563 (2d Cir. 1990) ("The question is not whether some other course would have been more successful. That can always be argued after a case has been lost. The question is whether counsel's conduct of the defense was a reasonable course at the time and came within the standards for acceptable representation.").

### 6. Leading Questions

Next, Alston argues that Trial Counsel was ineffective for not objecting to leading questions posed to cooperating witness. (Alston Aff. 20). The question of whether and when to object to the form of a question is the sort of routine, strategic trial decision that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### 7. Request to Charge

Alston claims that Trial Counsel should have submitted requests to charge arguing that, as a police officer, he could not be charged under Section 924(c) for carrying his service weapon. (Alston Aff. 20, 25-26). As noted, the Second Circuit has rejected Alston's contention that he

could not be so charged, *see Alston*, 839 F.3d at 145, so it cannot be objectively unreasonable for Trial Counsel to fail to raise a meritless argument.

8. Sentencing

Finally, Alston makes a series of objections related to his sentencing.

Alston's claims are meritless.[2]

First, he argues that defense counsel should have prepared a "version of the offense" for inclusion in the PSR, and that he should have "provide[d] objection to Probation Department's sentencing letter." (Alston Aff. 20). In fact, Trial Counsel provided a detailed letter setting forth factual and Guidelines objections to the initial pre-sentence report, a copy of which is attached as Exhibit A. *See also* PSR at pp. 19-22 (discussing defense objections). Moreover, the various Guidelines enhancements that Alston disputed were appealed to the Second Circuit, and the Circuit affirmed the relevant enhancements. *See Alston*, 899 F.3d at 148-49.

Second, Alston argues that Trial Counsel did not timely provide the PSR to him. (Alston Aff. 20). But at his sentencing, Alston's current counsel affirmed that he had reviewed the PSR with his client. (Sent. Tr. 5). Current counsel then had ample opportunity to elaborate on whatever objections he sought to interpose.

Third, Alston argues that his Trial Counsel were ineffective for not gathering letters of support on his behalf. (Alston Aff. 20). But numerous letters of support were in fact submitted on his behalf. (Dkt. 132). And in the end it is Alston's current counsel, not Trial Counsel, who are responsible for the contents of the sentencing submission.

At bottom, Alston's petition amounts to an exercise in Monday morning quarterbacking of Trial Counsel's performance. But that is precisely what *Strickland* holds to be an insufficient basis

---

[2] I should note that Trial Counsel were replaced by Alston's current counsel prior to his actual sentencing. I interpret his motion as being directed to the actions or inactions of Trial Counsel, who did participate in the pre-sentence process until they were relieved.

for a claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 689. And in fact, as this Court commented at the end of the trial, this was an "exceptionally well tried case." (Trial Tr. 1120).

## II.    ALSTON HAS NOT DEMONSTRATE PREJUDICE

The evidence of Alston's guilt was overwhelming. None of his frivolous claims in anyway undermine his convictions. As this Court said at sentencing:

> Well, the jury has spoken, but I must say, Mr. Alston, that I would have reached the same verdict if I had been the jury, and I would have done it with, as the jury did, shock, dismay, great reluctance to believe that it could be true, but I would have reached that verdict, not only because of Gabriel Reyes, not only because of the other witnesses, who the jury obviously found to be credible, but because in the end, your own mouth condemned you.

(Dkt 139 at 22-23).

In sum, Alston has failed to satisfy his burden of showing prejudice from his claimed errors.

### Alston's Request to Take Discovery Regarding Possible Government Brady Violations

Alston has brought an ancillary motion asking this Court to order the Government to provide him with discovery regarding Reyes's jailhouse misconduct.

On the eve of sentencing, the Government disclosed to the Court and the defendant that it had recently learned that Reyes, the principal witness against Alston at trial, had been involved in misconduct while incarcerated at the MCC:

> The Government writes to apprise the Court that the Government has learned that, in early 2017, well after the defendant's trial, Reyes possessed cigarettes and marijuana in prison on several occasions. Specifically, Reyes was operating a store, which sold food and other commissary items to inmates who wanted such items at a time when the commissary was closed to them. On approximately 15-20 occasions, Reyes accepted cigarettes or marijuana as payment for food— cigarettes and marijuana are sufficiently prevalent in the jail that they are often used as currency—and then traded the cigarettes or marijuana to other inmates in exchange for more food for his store. Reyes did not use the marijuana. Reyes candidly admitted the foregoing when asked, and the Government

respectfully submits that these facts do not bear on Reyes's credibility.

Government Letter dated July 25, 2017, ECF Document #135.

Alston actually argued on appeal that Reyes's jailhouse misconduct, and the government's

denial of Alston's post-conviction discovery requests about that misconduct, constitute a *Brady*

violation requiring grant of a new trial. In rejecting this claim, the Court of Appeals held:

> Even treating Reyes's jailhouse misconduct as potentially worthy impeachment evidence, it is not *Brady* material. The government did not "suppress" the evidence at issue, because Reyes's misconduct did not occur (and therefore the evidence did not exist) until *after* Alston's trial was concluded. Here, so far as the record shows, the government appropriately disclosed what it learned about Reyes's misconduct promptly after the information came to its attention. The government obviously is not required to disclose before or during trial information that it only learned after trial was over. *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). Nor, in any event, did Alston suffer prejudice at trial from his ignorance of Reyes's post-trial possession of contraband, because Alston could not have cross-examined Reyes about misconduct that Reyes had not yet committed. The District Court, therefore, did not err in denying Alston discovery relating to Reyes's jailhouse misconduct, and Alston's *Brady* allegations do not entitle him to a new trial.

*United States v. Alston*, 899 F.3d at 147.  Nothing has changed since the Court of Appeals

issued its ruling to suggest post-trial discovery is now warranted.

Defendant's motion for post-trial discovery into the cooperating witnesses post-trial

misconduct is denied.

**Conclusion**

Alston's motion to set aside his conviction is DENIED.

The Court declines to issue a certificate of appealability because there has been no

"substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see United*

*States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997).  Further, the Court finds, pursuant to 28 U.S.C.

§ 1915(a)(3) that any appeal from an order denying Alston's motion would not be taken in good

faith. *See Feliz v. United States*, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002).

This constitutes the decision and order of the court.

Dated:  June 10, 2021

_____

Colleen McMahon
District Court Judge

BY ECF TO ALL PARTIES